**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| KEITH BRANNON and MIRANDA BRANNON, Individually and on Behalf of Those Similarly Situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>WESTGATE RESORTS, INC., WESTGATE RESORTS, LTD., CENTRAL FLORIDA INVESTMENTS, INC., CFI RESORTS MANAGEMENT, INC., WESTGATE GV SALES & MARKETING, LLC, and WESTGATE GV AT EMERALD POINTE, LLC,<br><br>        Defendants. | Civil Action No. 6:19-cv-01750<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Keith Brannon and Miranda Brannon ("Brannons" or "Plaintiffs") bring this action on behalf of themselves and all other persons similarly situated against the above-named Defendants (collectively "Westgate" or "Defendants"). Plaintiffs allege the following based on information and belief, the investigation of counsel, and personal knowledge.

### NATURE OF CASE & BACKGROUND FACTS

1.    Plaintiffs bring this action individually and on behalf of the proposed class (the "Class"), as more fully defined below, for the benefit and protection of all current and former owners or purchasers of timeshares at Westgate's Branson Lakes Resort ("the Resort") located in Hollister, Missouri.

2.    Westgate uses a high-pressure sales scheme that involves convincing prospective purchasers to buy into its vacation timeshare program while failing to

disclose material and legally-required information to buyers. Through this scheme, Westgate (a) fails to provide legally-required disclosures, and (b) fails to provide purchasers with adequate access to their timeshares.

3.   Westgate fails to provide customers with legally-required disclosures, specifically: (a) by failing to adequately train and supervise its sales agents; (b) by failing to provide sales agents with disclosures to give to prospective customers; and, (c) by encouraging sales agents to lie to customers in the context of high-pressure sales pitches.

4.   Westgate relies on its closing agents to provide written disclosures, but then provides these agents with a closing folio that contains a "secret pocket" where closing agents can conceal legally required disclosures about the purchasers' rights, including their statutory right to cancel their purchase.

5.   Westgate also fails to provide purchasers adequate access to their timeshares, specifically: (a) by failing to adequately disclose to purchasers that their timeshare interest will be subject to a "floating use" plan; (b) by failing to adequately describe to purchasers the terms of the "floating use" plan; and, (c) through the "floating use" plan, failing to provide purchasers reasonable access to their timeshares.

6.   As a result of the common scheme, Westgate owners are left paying thousands of dollars in purchase prices, upgrade costs, and annual maintenance fees, all on timeshare units they are frequently unable to use as advertised and rarely—if ever—able to use as reasonably expected.

7.   Westgate's aggressive business model relies on one essential premise: it makes money by selling shares in property units, not from customers using the weeks they have purchased in those units. In fact, Westgate has a strong incentive to sell as many ownership shares as possible in a piece of property. It can then further increase its

profits by limiting owners' use of the units so they can be rented out by Westgate for additional profit or used by Westgate as sample units to sell timeshare properties to new buyers.

8.   In this way, Westgate profits many times over by selling and overselling various interests in one piece of property: it can sell the property at a premium, rent it repeatedly, and continuously use it as a tool to induce new sales—sometimes all at once.

9.   Westgate fails to disclose material facts to buyers and, as a result, fails to deliver what buyers reasonably expect, all in violation of the law, including the Missouri Merchandising Practices Act.

## PARTIES

10.   Plaintiffs Keith Brannon and Miranda Brannon are a residents of Greenwood, Arkansas.

11.   Defendants are Westgate Resorts, Inc., Westgate Resorts, Ltd., Central Florida Investments, Inc., CFI Resorts Management, Inc., Westgate GV Sales & Marketing, LLC, and Westgate GV at Emerald Pointe, LLC.[1]

12.   Westgate Resorts, Inc., is a Florida corporation that is a citizen of the State of Florida with its principal place of business in this District and Division. It is licensed to conduct and conducts business in Missouri under the name "Westgate Resorts Sales, Inc." It is the general partner of Westgate Resorts, Ltd., and manages both Westgate GV Sales & Marketing, LLC, and Westgate GV at Emerald Pointe, LLC. Westgate Resorts, Inc.'s Missouri control number is F00806692, its Missouri registered agent is CSC-Lawyers Incorporating Service Company, 221 Bolivar Street, Jefferson City, Missouri

---

[1] Plaintiffs allege claims against all Defendants as alter egos of one another, as explained more fully herein. To the extent any Defendant had a discreet, distinguishable role in causing the injuries alleged, such information is exclusively in Defendants' possession.

65101, and its principal office is at 5601 Windover Drive, Orlando, FL 32819. At all times relevant to this case, Westgate Resorts, Inc., managed, marketed and/or operated the Westgate Branson Lakes Resort in Hollister, Missouri.

13.     Defendant Westgate Resorts, Ltd., is a Florida partnership that is a Florida citizen with its principal place of business in this District and Division. It is licensed to and conduct and conducts business in Missouri under the name "Westgate Resorts, L.P." Its general partner is Westgate Resorts, Inc., and it is the sole member of Westgate GV at Emerald Pointe. Westgate Resorts, Ltd.'s Missouri control number is LF0582586, its Missouri registered agent is CSC-Lawyers Incorporating Service Company, 221 Bolivar Street, Jefferson City, Missouri 65101, and its principal office is at 5601 Windover Drive, Orlando, Florida 32819.  At all times relevant to this case, Westgate Resorts, Ltd., managed, marketed and/or operated the Westgate Branson Lakes Resort in Hollister, Missouri.

14.     Westgate GV Sales & Marketing, LLC, is a Florida limited liability company that is a citizen of the State of Florida with its principal place of business in this District and Division. It is licensed to conduct and conducts business in Missouri under the same name. It is managed by Westgate Resorts, Inc. Westgate GV Sales & Marketing, LLC's Missouri control number is FL0582570, its Missouri registered agent is CSC-Lawyers Incorporating Service Company, 221 Bolivar Street, Jefferson City, Missouri 65101, and its principal office is at 5601 Windover Drive, Orlando, Florida 32819. At all times relevant to this case, Westgate GV Sales & Marketing, LLC, conducted sales and marketing for the Resort.

15.     Westgate GV at Emerald Pointe, LLC, is a Florida limited liability company that is a citizen of the State of Florida with its principal place of business in this District

and Division. It is licensed to conduct and conducts business in Missouri under the name "Westgate GV at Emerald Point." It is managed by Westgate Resorts, Inc. Westgate GV at Emerald Pointe, LLC's Missouri control number is FL0582571, its Missouri registered agent is CSC-Lawyers Incorporating Service Company, 221 Bolivar Street, Jefferson City, Missouri 65101, and its principal office is at 5601 Windover Drive, Orlando, Florida 32819. At all times relevant to this case, Westgate GV at Emerald Pointe, LLC, managed, marketed and/or operated the Westgate Branson Lakes Resort in Hollister, Missouri.

16.     Central Florida Investments, Inc. ("CFI") is a Florida corporation that is a citizen of the State of Florida with its principal place of business in this District and Division at 5601 Windover Drive, Orlando, FL 32819. On its website, Westgate Resorts Ltd. states that it operates as a subsidiary of CFI.

17.     CFI Resorts Management, Inc. ("CFI Resorts Management") is a Florida corporation that is a citizen of the State of Florida with its principal place of business in this District and Division. It is licensed to conduct and conducts business in Missouri under the same name. CFI Resorts Management, Inc.'s Missouri control number is F00582636, its Missouri registered agent is CSC-Lawyers Incorporating Service Company, 221 Bolivar Street, Jefferson City, Missouri 65101, and its principal office is 5601 Windover Drive, Orlando, Florida 32819. It manages all resorts under the "Westgate" name.

18.     CFI, CFI Resorts Management, and Westgate Resorts, Inc., all have the same President/Secretary, David A. Siegel, and the same Treasurer/Chief Financial Officer, Thomas F. Dugan.

19.   At all times relevant to this Complaint, each of the Defendants was the agent, servant, partner, aider and abettor, co-conspirator and/or joint venture of each of the other Defendants and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy, and/or joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their collective conduct constituted a breach of duty owed to Plaintiffs that injured Plaintiffs.

20.   At all times relevant to this Complaint, Defendants, and each of them, were fully informed of the actions of their agents and employees, and thereafter no officer, director, or managing agent of Defendants repudiated those actions, which failure to repudiate constituted adoption and approval of said actions and all Defendants and each of them, thereby ratified those actions.

21.   At all times relevant to this Complaint, there existed a unity of interest in ownership between certain Defendants and other certain Defendants such that any individuality and separateness between the certain Defendants has ceased and these Defendants are the alter ego of the other certain Defendants and exerted control over those Defendants. Adherence to the fiction of the separate existence of these certain Defendants as entities distinct from other certain Defendants will permit an abuse of the corporate privilege and would sanction a fraud and/or would promote injustice.

## JURISDICTION AND VENUE

22.   **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because the matter in controversy exceeds $5,000,000, excluding interest and costs, and this is a class action in which certain of the Class members and Defendant are citizens of different states.

23.    **Personal Jurisdiction.** This Court has personal jurisdiction over Defendants because Defendants have continuous and systematic general business contacts in this State and District. All Defendants' principal places of business are located within this District and all could be said to be "at home" in this District and Division.

24.    **Venue.** Venue is proper in this judicial District under 28 U.S.C. §1391(b)(1)-(2) because Defendants reside in this District and all are residents of the State of Florida and because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District. Further, the contract between Plaintiffs and Defendants contains a venue selection clause providing that venue is proper in this District. Venue also is proper pursuant to 28 U.S.C. §1391(c)(2) because Defendants are deemed residents of this District by virtue of this Court's personal jurisdiction over all Defendants for purposes of this action.

## ADDITIONAL FACTUAL ALLEGATIONS

### A.    The Timeshare Industry.

25.    The U.S. timeshare industry was formed in the 1970s when hotel and resort developers struggled to sell full ownership condominium properties. Instead of selling actual condominiums, developers realized they could sell "ownership shares" to many customers, each of which theoretically gave an owner the right to use the property for certain amounts of time per year.

26.    Dividing one condominium or resort property into "ownership shares" and selling it over and over again to a number of different buyers is the fundamental concept underlying the modern timeshare industry.

27.    By selling a vacation timeshare unit incrementally, a timeshare developer makes far more money than if it sold the same unit to a single buyer at market price. For

example, a timeshare developer could build 150 condominiums which, individually, might sell for $200,000 each. Using a timeshare approach, the developer could sell two-week timeshares in each unit for a total of 26 "timeshares" and charge, perhaps, $20,000 each. Through this timeshare method, the developer's per-unit investment would bring in $520,000 rather than $200,000.

28.    Westgate takes the above method several steps further by selling far more than 26 timeshares in a single unit, which exponentially increases its profits while virtually guaranteeing that the unit paid for by a purchaser will never be available for use.

29.    The timeshare industry is thriving. In 2015, approximately 9.2 million American households owned timeshares. At that time, there were 1,547 timeshare resorts in the United States with a total of approximately 200,720 individual units available. That year, the timeshare industry sold $8.6 billion worth of timeshares to consumers, with an average maintenance price of $22,240 and average maintenance fees of $920.

30.    The timeshare industry also is in a period of substantial growth. Timeshare sales volumes have increased by more than 33% since 2011, or, as the industry reports, at an average annual rate of 7%. From 2015 to 2016 sales volumes rose from $8.6 billion to $9.2 billion—an increase of nearly 7%.

31.    Many timeshare corporations—including Westgate—lend money to consumers to finance their timeshare purchases. The corporations then convert the timeshare promissory notes into securities that are rated and sold in financial markets. Since 1992, Westgate has sold approximately $3.4 billion in notes on the securities market.

32.     The timeshare industry's record profits, however, are driven by sales of ownership shares, not by consumers' use and enjoyment of their properties. As noted, timeshare businesses make money when consumers make down payments for or monthly payments on a timeshare property, rather than when those properties are used. Actual use of a property prevents the company from renting it to a different consumer or using it to entice a prospective purchaser. Selling units to new customers and nicer, more expensive units to existing customers is how timeshare industry thrives.

### B.     Westgate's Unlawful Conduct and Sales Tactics.

33.     Because of its incentives to sell units, the timeshare industry is a breeding ground for fraudulent sales tactics like those employed by Westgate. Timeshare businesses rely on owners' inability to resell their timeshare interests and also profit from substantial "maintenance fees" charged to each owner.

34.     Recently, regulators throughout the United States have started enforcing consumer protection laws against timeshare industry participants. The U.S. Consumer Financial Protection Bureau ("CFPB"), for instance, has investigated Westgate

> to determine whether persons involved in the sale and
> financing of timeshares have engaged in, or are engaging in,
> acts or practices in violation of Sections 1031 and 1036 of
> the [Consumer Financial Protection Act], 12 U.S.C. §§ 5531
> and 5536, the Fair Debt Collection Practices Act, 15 U.S.C.
> §§ 1692 et seq., the Electronic Funds Transfer Act, 15
> U.S.C. § 1693 et seq., the Fair Credit Billing Act (FCBA),
> 15 U.S.C. §§ 1666 et seq., their implementing regulations,
> or any other Federal consumer financial law.[2]

---

[2] Decision and Order, *In the Matter of Westgate Resorts, Ltd.*, 2015-MISC-WESTGATE RESORTS, LTD-0001, (U.S. Consumer Financial Protection Bureau, March 11, 2016) available at http://files.consumerfinance.gov/f/201603_cfpb_decision-and-order-on-petition-by-westgateresorts-ltd-to-modify-or-set-aside-civil-investigative-demand.pdf.

35.     Westgate in particular fails to adequately train or supervise its sales agents, who are encouraged to use high-pressure sales tactics to induce prospective purchasers to buy into its vacation timeshare program while failing to disclose material and legally-required information.

36.     Westgate also provides sales and closing agents with a folio, which is given to purchasers and contains the purchasers' documentation. These folios, however, contain a "secret pocket," which, as Westgate knows, sales and closing agents use to conceal required documents—including disclosures regarding the purchaser's statutory right to cancel the purchase.

37.     Westgate also fails to adequately disclose to purchasers that they are not purchasing a share in a specific unit but are instead a "floating use plan." Westgate fails to adequately disclose how the "floating use plan" actually works. Additionally, Westgate fails to adequately disclose that Westgate may delay delivery of a deed to the purchasers for a period of years.

38.     Finally, Westgate fails to disclose to purchasers that it oversells and restricts the availability of the Resort's properties (by, for example, renting the properties to non-owners, using the properties as model units, selling to purchasers when no units are available to be deeded, and closing units for maintenance), and fails to disclose that purchasers will not be able to use their timeshare purchase as advertised or as reasonably expected.

39.     All of the above-described acts violate the Missouri Merchandising Practices Act (among other laws) and will be described in greater detail below.

**1.     Westgate Uses High-Pressure Sales Tactics and Misrepresentations to Induce Consumers to Make Purchases They Do Not Understand.**

40.     Westgate sales agents employ a combination of high-pressure, marathon-length sales presentations and misrepresentations about the nature of consumers' timeshare "ownership" to induce consumers to purchase timeshare properties they very likely will never use.

41.     The process begins when Westgate agents approach vacationers on the streets, in restaurants, and other public areas of Branson, Missouri—and other towns in the area—and offer a variety of incentives, from free tickets to local attractions, to discounts on timeshare purchases, to vouchers for free meals, in order to entice these unwary consumers to take a tour of the Resort.

42.     Once these vacationers arrive at the Resort for the tour, Westgate agents subject them to a high-pressure sales pitch—in some instances lasting as long as eight hours—designed to ensure that they do not leave without purchasing a timeshare property. Westgate agents attempt to persuade prospective purchasers by telling them that a timeshare is cheaper than paying for future vacations, but that they must act immediately in order to take advantage of supposedly discounted prices.

43.     Many consumers worn down by these tactics assent to purchase a timeshare, but are then rushed by sales and closing agents to sign a series of complex and misleading legal documents often without the opportunity to read them.  Oftentimes, the consumers do not even see the documents they are signing because Westgate agents utilize an electronic signature process that automatically applies signatures and initials to dozens of pages of contract documents without review.

44.     The high-pressure sales tactics do not stop once Westgate completes a sale: existing owners face constant pressure from Westgate agents and employees to upgrade to nicer units. For example, Westgate assigns owners a "concierge," supposedly to assist them with booking and other transactions, but who, in fact, is a salesperson who pressures owners to "upgrade" their prior purchase—selling back their initial property and purchasing a nicer, larger, or deluxe property.

45.     Westgate also pressures timeshare owners to come to an annual "owners' meeting," which it represents is a mandatory meeting for timeshare owners at the Resort. In reality, the owners' meeting is an all-day, one-on-one sales meeting with Westgate agents, who similarly attempt to pressure timeshare owners to upgrade to a nicer property. Westgate agents use the so-called "owners' meeting" to wear down owners by giving them a long, confusing tour of Resort and urging them to upgrade to a more expensive property at the Resort.

**2.     Westgate Deliberately Misleads Consumers Regarding the Use and Enjoyment of Their Timeshares and Actively Trains Its Sales Agents to Do the Same.**

46.     Westgate specifically trains its sales agents to make misrepresentations and omissions during the above-described sales process.

47.     Westgate Resorts Vice President Richard Siegel has been captured on video telling sales agents to "lie" in order to complete a sale:

> You should own at least one week yourselves—and if you don't, lie and say you do! Don't let these people leave here without buying something! Something! . . . 100% of the people we are talking to are—it's not a nice word, but we call 'em mooches. They're coming in for a sales presentation on their vacation for a free gift. So, we train our sales people on how to take someone greedy like that and get them to buy today. We do 100% of our sales on the

> first day. They will not buy today if they don't get a 'great
> deal' [making air quotes]—if they don't *believe* that
> they're getting a great deal . . . Timesharing you sell every
> unit 52 times because you sell it by the week.[3]

48.    Westgate represents to prospective purchasers that, as timeshare owners,

they will have no difficulty using their timeshare unit whenever they want, provided they

book with at least 24 hours' notice. On its website, Westgate states that owners will

enjoy "[a]n easy, flexible floating program where you can choose where, when, and how

you want to vacation—the vacation possibilities are endless." In reality, Westgate fails to

disclose that timeshare owners are routinely unable to book units in the Resort with as

much as 12 months' notice—the earliest Westgate allows owners to reserve the use of

their timeshare. As a result, many Class Members have been entirely unable to use their

timeshare property for an entire year.

49.    Westgate specifically fails to disclose to purchasers that thousands people

own timeshare properties at the Resort, with some "owning" multiple "weeks," limiting

each owner's ability to use and enjoy the timeshare property for which he or she paid.

50.    Likewise, Westgate fails to disclose to purchasers that it sets aside a

substantial number of units in the Resort as vacation rentals, further restricting the

supply of units available for timeshare owners to use. In other words, Westgate chooses

to rent units out—including the specific units it lists in deeds of sale to timeshare

owners—instead of making them available to owners.

51.    Furthermore, Westgate does not inform purchasers that certain purchasers

may not receive a deed, for a period of years, but will still be able to make reservations,

thereby diluting the availability for existing owners.

---

[3] *The Queen of Versailles* (2012), excerpt available at https://www.youtube.com/watch?v=
W9G9RD5fnsw.

52.     Finally, Westgate does not inform purchasers that it sets aside large numbers of demonstration units for the near-constant tours and sales efforts it uses to generate new timeshare business. Because the profitability of Westgate's timeshare business largely depends on sales of new and upgraded units, the Resort devotes substantial resources to high-pressure sales tours, during which dozens to hundreds of prospective purchasers are brought each day through many of the nicest timeshare units at the Resort. None of these units are available to the owners who have legitimately paid for the right access to them.

53.     Westgate sales agents give purchasers the impression that they are purchasing the right to use a specific unit at the Resort. In reality, they are participating in Westgate's "floating use plan," which gives owners the right to use a certain type of unit, subject to availability. And units are rarely, if ever, available to "owners," as advertised or expected.

54.     The purchase documents Westgate drafts and requires purchasers to sign lead them to believe that they are purchasing a share in a specific unit in the property. However, in the fine print of Westgate's "floating use plan," purchasers relinquish their rights to possess and use specific units at the Resort. Westgate sales agents do not disclose this to purchasers during the high-pressure sales process.

55.     Westgate does not even give owners the right to use similar units at the Resort. Despite making repeated representations in the high-pressure sales pitches that owners can book their specific unit, or an identical one, for use anytime in the time period purchased, Westgate routinely prevents owners from booking the unit type. In this way, Westgate's "floating use plan"—which it does not adequately describe to timeshare purchasers—fails to provide purchasers reasonable access to their timeshares.

### 3.   Westgate Uses a "Secret Pocket" to Conceal Legally Required Disclosures from Consumers.

56.   To protect consumers from abusive practices like those employed by Westgate, Missouri law requires a timeshare developer to make certain disclosures to purchasers, including informing them of their right to cancel the contract after leaving the high-pressure sales pitch. Westgate routinely uses a folio containing a secret pocket that enables its commission-based closing agents to conceal the disclosures so consumers will not find them and try to cancel their purchase.

57.   Specifically, the Missouri Merchandising Practices Act, R.S.Mo. § 407.620, requires a timeshare developer to provide each purchaser a printed notice of the purchaser's right to cancel the contract within five days. R.S.Mo. § 407.620 requires that such disclosures be in 18-point, bold-faced font and presented in the manner described by that section.

58.   R.S.Mo. § 407.625 further requires that, prior to execution of the sales contract, timeshare developers make a number of disclosures to purchasers about "exchange programs," including whether the purchasers' participation in these programs is voluntary or mandatory.

59.   It is Westgate's standard practice to give each new purchaser who buys a vacation timeshare at the Resort a black folio. Generally made of black faux leather, the folio zips shut and has numerous readily visible pockets on the outside and on the inside. There is room for documents to simply be placed inside without being in any pocket, since the entire folio zips shut. The black folio contains Westgate's name and logo on the inside.

60.   Unbeknownst to the purchaser, important and legally-required documents—including the purchase contract, notice of right to cancel, and information related to

Westgate's exchange program—are surreptitiously placed within a "secret pocket" inside this black folio. This secret pocket is not apparent to purchasers who look at or search inside their black folios.

61.     Westgate's commission-based sales representatives routinely do not inform purchasers that the notice of right to cancel, purchase contract, and exchange program information are concealed within the secret pocket. Thus, while purchasers technically have  the legally required documents—including the notice of right to cancel—they are unaware of this fact and are not informed of their right to cancel.

62.     In this way, Westgate's concealment prevents purchasers from exercising their legal right to cancel the contract.[4]

**C.     Plaintiffs Keith and Miranda Brannon.**

63.     Plaintiffs Keith and Miranda Brannon visited Branson, Missouri in early November 2015. While walking around the town at approximately 9:00 am, the couple was stopped by a Westgate sales associate who promised them free tickets to an evening show if they agreed to listen to a short, one- to two-hour, presentation about timeshare opportunities at Westgate's Branson Lakes/Emerald Pointe Resort.

64.     The Brannons agreed and were promptly subjected to an eight-hour, high-pressure timeshare sales pitch during which they were offered a variety of timeshares at continuously diminishing prices. The sales associate, Harry J. Hinz, persisted in his sales pitch even when the Brannons expressed no interest in purchasing a timeshare, and, in addition to reducing unit prices, represented that timeshares accrued in value, could serve as an inheritance, and that the Brannons were receiving a special military

---

[4] Paul Brinkmann, "Westgate Resorts denies hiding cancellation documents," Orlando Sentinel (Sept. 30, 2015), *available at* https://www.orlandosentinel.com/business/brinkmann-on-business/os-westgate-resorts-cancellation-20150930-post.html.

discount. At no time did the sales associate state that the Brannons were not actually purchasing the right to use a specific unit or even type of unit, but instead a "floating use plan" that would not guarantee their ability to stay at the Resort.

65.     After being subjected to this eight-hour, high-pressure and misleading sales pitch, the Brannons eventually agreed to purchase a two-bedroom "deluxe" unit they were entitled to use once a week every other year, in odd-numbered years. Including closing costs and other fees, this unit cost $7,262.27. Brannon made a down payment of $985 and the remaining $6,277.27 was financed by Westgate.

66.     To make monthly payments, the Westgate sales associate pushed the Brannons to sign up for a Westgate credit card. The Brannons did so, authorizing Central Florida Investments, Inc., to charge their credit account $101.24 per month. In addition to these payments, the Brannons were told they would pay $745 in maintenance fees every year.

67.     The Westgate associates rushed the Brannons through the signing process, giving the Brannons little to no time to thoroughly review the documents they were signing. At the conclusion of this process, the associates handed the Brannons a black folio similar to the type described above. The inside pockets contained only a welcome folder and an overview of the Westgate property at which the Brannons had purchased their timeshare.

68.     At no time did the sales associate reveal that he had placed important, legally-required documents inside the folio's secret pocket, that the Brannons were purchasing a "floating use plan" rather than an individual timeshare unit or disclose to the Brannons that they had a right to cancel their timeshare agreement within five days.

69.   The Brannons immediately had misgivings about the purchase of this Westgate timeshare. In the following days, they attempted to cancel their Westgate credit card and made calls to inquire about cancelling their timeshare as well. The Westgate representatives with whom the Brannons spoke were unresponsive and unhelpful, though the Brannons eventually succeeded in cancelling their Westgate credit card.

70.   In mid-2018, the Brannons determined they did not want to pay for or use the Westgate timeshare they had purchased and again reached out to Westgate regarding sale of their unit. Instead of aiding in this process, Westgate referred the Brannons to a third-party seller that demanded $1,500 upfront to advertise the Brannons' unit and made no guarantees about the success of its sales efforts.

71.   Dissatisfied, the Brannons again contacted Westgate and asked to see their purchase contract. After a delay of almost a month, Westgate sent the Brannons a copy of the two-page purchase contract. In so doing, Westgate again failed to advise the Brannons that a copy of this purchase contract was contained inside the black folio's secret pocket—along with nearly 50 other pages of important documents. In September 2018, after reading about the existence of a secret pocket in Westgate folios, the Brannons discovered the secret pocket in their own folio, which contained numerous important documents, including the notice of right to cancel.

## CLASS ACTION ALLEGATIONS

72.   Plaintiffs request this Court certify the following Class under Rule 23 of the Federal Rules of Civil Procedure:

> All residents of the United States and its territories who
> purchased vacation timeshare units from the Westgate
> Branson Lakes/Emerald Pointe Resort located in Hollister,
> Missouri.

73.     Plaintiffs reserve the right to amend the Class definition and, if deemed appropriate, to divide the Class into subclasses.

74.     This action is brought and may properly be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

a.     **Numerosity**: The potential members of the Class as defined are so numerous that joinder of all the Class members is impracticable.

b.     **Commonality**: There are questions of law and fact common to Plaintiffs and the Class that predominate over any questions affecting only individual members of the Class. These common questions of law and fact include, but are not limited to:

    i.     whether Westgate omitted material information to the proposed Class members about the nature of the timeshare purchase transaction;

    ii.     whether Westgate omitted material information to the proposed Class members about the availability of timeshare properties for booking; whether Westgate produced a false impression in order to mislead the proposed Class members or to obtain an undue advantage over them;

    iii.     whether Westgate owed a duty to the proposed Class members to disclose omitted information;

    iv.     whether Westgate provided proposed Class members a legally adequate timesharing plan;

    v.     whether these omissions were material;

    vi.     whether Westgate's policies and procedures limit the proposed Class members' ability to use and enjoy the timeshare properties they own;

vii.    whether Westgate adequately provided the proposed Class with a notice
of right to cancel that contained, among other things, specific rescission
language;

viii.   whether Westgate adequately provided the proposed Class with a
contract that included specific rescission language;

ix.    whether Westgate utilized a scheme to encourage its closing officers to
conceal required disclosures, notice of right to cancel, from the proposed
Class members by hiding them in the folio, compensating them on a
commission basis, and failing to train and supervise them;

x.    whether Westgate's actions were deliberate;

xi.    whether Westgate's conduct was part of a pattern and practice within
Westgate that was designed to reduce the number of contracts that are
cancelled;

xii.    whether any false warranties, misrepresentations, and material omissions
by Westgate caused the proposed Class members' injuries;

xiii.   whether Westgate fraudulently induced the proposed Class members to
sign the contract and remain in the contract through the rescission
period, and

xiv.    whether Westgate otherwise defrauded the proposed Class members;
and

xv.    whether Westgate should be required to disgorge profits to the proposed
Class members.

c.    **Typicality**: Plaintiffs' claims are typical of the claims of the Class.
Westgate's common course of conduct in violation of law as alleged herein

has caused Plaintiffs and Class members to sustain the same or similar injuries and damages. Plaintiffs' claims are thereby representative of and coextensive with the claims of the Class.

d.   **Adequacy of Representation**: Plaintiffs are members of the Class, do not have any conflicts of interest with other proposed Class members, and will prosecute the case vigorously on behalf of the Class. Counsel representing Plaintiffs are competent and experienced in litigating complex class actions throughout the United States. Plaintiffs will fairly and adequately represent and protect the interests of Class members.

e.   **Superiority of a Class Action**: A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individual joinder of all Class members is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class. Each Class member has been damaged and is entitled to recovery by reason of Westgate's improper practices. Class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system. The injury suffered by each Class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions economically feasible. Individualized litigation increases the delay and expense to all parties and the Court. By contrast, class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

75.     The Class may be certified because the prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudication and, in turn, would establish incompatible standards of conduct for Westgate.

76.     The nature of notice to the proposed Class is contemplated to be by direct mail upon certification of the Class or, if such notice is not practicable, by the best notice practicable under the circumstances, including email, publication in major newspapers, and/or on the Internet.

## STATUES OF LIMITATIONS, FRAUDULENT CONCEALMENT, AND ESTOPPEL

### A.     Discovery Rule.

77.     The cause of action did not accrue until Plaintiffs and the Class discovered, or could have discovered with reasonable diligence, the facts omitted and/or concealed by Westgate.

78.     Plaintiffs and the Class had no realistic ability to discern the true nature and value of their timeshare property purchases because Westgate's subsequent actions and omissions defined Plaintiffs' and the Class's ability to use and enjoy their properties.

### B.     Fraudulent Concealment.

79.     Any applicable statutes of limitation have been tolled by Westgate's knowing, active, and ongoing concealment and denial of the material facts alleged herein.

80.     Westgate is a sophisticated party with superior knowledge of complex real estate and business transactions. Westgate was and is under a continuous duty to disclose to Plaintiffs and the Class the material facts alleged herein, and Plaintiffs and the Class reasonably relied on Westgate's knowing, affirmative, and ongoing concealment.

81.    Plaintiffs and the Class have been kept ignorant by Westgate of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.

**C.    Estoppel.**

82.    Westgate was and is under a continuous duty to disclose to Plaintiffs and the Class the true character, quality, and nature of the timeshare properties and transactions as alleged herein. That concealment is ongoing. Plaintiffs and the Class reasonably relied on Westgate's knowing failure to disclose and/or active concealment of those facts.

83.    Westgate is estopped from relying on any statutes of limitation in defense of this action. Additionally, Westgate is estopped from raising any defense of laches due to its own conduct as alleged herein.

84.    Plaintiffs make the following specific fraud/fraudulent omission allegations with as much specificity as possible, although Plaintiffs do not have access to information necessarily available only to Westgate:

a.    ***Who***: Westgate, including each of the alter ego Defendants identified in this Complaint, and their agents, servants, and employees utilized a scheme to encourage the active concealment of legally required disclosures (including, but not limited to, the fact that Plaintiffs had a right to rescind the purchase) and other material facts about the timeshare transactions from Plaintiffs and the Class, while simultaneously representing that Plaintiffs could use and enjoy their timeshare unit whenever they wished. Plaintiffs are unaware of, and therefore unable to identify, all the names and identities of those specific individuals at Westgate responsible for such decisions, but they include the

specific agents Jamie Johnson, John Willman, Harry Hinz, and Westgate officials David A. Siegel and Richard Siegel.

b.  ***What***: Westgate knows but fails to adequately disclose to purchasers that: they are not purchasing a share in a specific unit but are buying into a "floating use plan," in which each timeshare owner's fractional interest is diluted many times more than if that person purchased the right to use a particular unit; because Westgate fails to disclose that purchasers are buying into a "floating use plan," it also fails to make disclosures about the nature of the "floating use plan," in violation of R.S.Mo. § 407.625; Westgate encourages and/or allows its commission-based sales and closing agents to use a "secret pocket" to conceal legally required disclosures about the purchasers' rights, including their statutory right to rescind their purchase, in violation of R.S.Mo. § 407.620.

c.  ***When***: Westgate concealed material information starting no later than July 1, 2008, and has done so on an ongoing basis through this day. Westgate has not adequately disclosed the truth about the true nature and availability of timeshare properties at the Resort, or purchasers' legal rights including the right to rescind the transaction, to anyone outside of Westgate. Westgate has never taken any action to inform consumers about the true nature and availability of the timeshare properties at the Resort, or purchasers' rights with respect to the transactions. When consumers have complained to Westgate about the unavailability of properties, Westgate has denied any knowledge of or responsibility for the problem, and in many cases has attempted to sell purchasers new or upgraded timeshare properties.

d. ***Where***: Westgate concealed material information regarding the true nature and availability of the timeshare properties, and purchasers' rights in the transaction, in its communications with Plaintiffs and the Class, and made contrary representations about the nature and availability of the timeshare properties. Plaintiffs are aware of no document, communication, or other place or thing, in which Westgate adequately disclosed the truth about the lack of availability of timeshare properties to anyone outside of Westgate. Even where certain legal disclosures were included in the fine print of a sales contract or other purchase document, the documents themselves were often concealed from Plaintiffs and the Class by commission-based sales and closing agents through the use of a folio containing a "secret pocket" and the other high-pressure sales tactics described herein, including statements from licensed sales agents which materially contradict the disclosure.

e. ***How***: Westgate concealed material information regarding the true nature and availability of the timeshare properties, and purchasers' rights in the transaction, at all times, even though it knew about the lack of availability of timeshare properties due to Westgate's artificial restriction of them, and about the legally required disclosures (including the right to rescind), and knew that this information would be important to a reasonable consumer. Westgate concealed this information by using high-pressure sales tactics, commission-based sales agents, and a black folio containing a secret pocket which closing agents could use so that purchasers would not be able to find material information (including legally required disclosures) relating to their timeshare transactions.

f. ***Why*:** Westgate actively concealed material information about the timeshare transactions, the "floating use plan," purchasers' ability to use and enjoy their purchase, and each purchaser's right to rescind the transaction for the purpose of inducing Plaintiffs and the Class to purchase timeshare properties and, once they owned timeshare properties, to purchase additional timeshare properties and services from Westgate. Had Westgate disclosed the truth—in, for example, its sales pitches, advertisements, or other materials or communications—Plaintiffs and reasonable consumers would have been aware of it and would not have purchased timeshare properties (including by exercising their right to rescind their purchase contracts), or would have paid less for them.

## FORCE AND EFFECT OF CONTRACTS

85. Westgate's contracts with Plaintiffs and the Class are either void or voidable and should be rescinded and avoided.

86. Westgate's contracts with purchasers are void because they are premised on a fraud and because Westgate does not give purchasers a reasonable opportunity to know the contract's character or essential terms. Westgate agents often utilize an electronic signature process that automatically applies purchasers' signatures and initials to dozens of pages of contract documents that purchasers are not permitted to adequately read and review. These signatures are ineffective as a matter of law.

87. Westgate's contracts with purchasers should be rescinded and voided because they violate statutes enacted for the protection of the public interests and

specifically for the protection of timeshare purchasers, including but not limited to the

Missouri Merchandising Practices Act, R.S.Mo. §§ 407.010 *et seq.*, as more fully detailed

herein.

88.    Westgate's contracts with purchasers should be rescinded and voided

because they are based on fraudulent omissions including, but not limited to, the failure

to disclose to purchasers: that they are not purchasing a share in a specific unit, that

Westgate oversells the Resort, that purchasers cannot reasonably reserve and use their

timeshare unit, and that purchasers have a statutory right to rescind the contract.

Westgate's bargaining power, moreover, is far superior to that of purchasers, and it

enters into contracts by unconscionable means, including under circumstances where

Westgate has undue influence over purchasers, and/or circumstances that constitute

duress and/or abuse of economic power. For all of these reasons, Westgate's contracts

with purchasers should be rescinded and avoided.

## COUNT ONE
## VIOLATIONS OF THE MISSOURI
## MERCHANDISING PRACTICES ACT ("MMPA")
## R.S.Mo. §§ 407.010 *et seq.*
## (Against all Defendants)

89.    Plaintiffs incorporate by reference all preceding paragraphs as though fully

set forth herein.

90.    Westgate sold timeshare interests to Plaintiffs and members of the Class for

personal, family, or household use during the previous five years in Missouri.

91.    In connection with the sale of timeshare interests in Missouri, Westgate

purposefully deceived Plaintiffs and members of the Class by stating timeshares accrue

in value and can serve as an inheritance, and by stating that Plaintiffs and the Class were purchasing interests in a specific unit when they were, in fact, buying into a "floating use plan." In addition, Westgate went to great lengths to conceal legally-required documents—including the notice of right to cancel—in secret pocket within the folio provided to Plaintiffs and the Class.

92.    R.S.Mo. § 400.620 required Westgate to provide Plaintiffs and the Class with documents that specifically detailed their right to cancel the timeshare purchase contract within five days. By using a folio containing a secret pocket, compensating closing agents on commission, and encouraging and/or allowing them to hide the public offering statement and the contract in a secret pocket, Westgate willfully circumvented this requirement.

93.    This conduct is part of a pattern and practice within Westgate that is designed to reduce the number of contracts that are rescinded.  Specifically:

   a.   Westgate designs and/or buys folios that contain a secret or hidden pocket.

   b.   Westgate utilizes a compensation system that penalizes its closing agents when customers rescind their contracts.

   c.   Sales at Westgate often follow a predictable pattern in that there is typically a lengthy and high-pressure sales pitch by the sales agent or agents assigned to a particular customer, followed by a closing with a different closing agent. The sales agents do not typically attend the closing.

   d.   By the time of the closing, the customers are necessarily tired and worn down from the sales pitch.

   e.   During the closing, customers are presented with numerous documents to sign in short order, with minimal or incorrect explanation by the closing officer, and

without the opportunity to fully review the documents. Documents signed at

closing might typically include a settlement statement, power of attorney,

allonge, acknowledgement of representations, truth in lending disclosure,

acknowledgment of recording, and other documents.

f.   Following the closing, the closing officer typically takes away all of the closing

documents that have been signed to be copied.

g.   Later, the purchasers are presented with a black folio to conclude the sales

process. Normally, the black folio contains numerous documents, including,

but not limited to, sales brochures, maps, resort directories, and other booklets

and brochures.

94.   Westgate incentivizes the closing agent and/or sales staff (a) not to mention

or downplay that the purchasers have a statutory right of rescission; (b) to encourage the

purchasers to sign the purchase contract and notice of right to cancel without fully

examining the purchase contract and the notice, and (c) to place the purchase contract

and the notice in the secret pocket so that the purchasers will not realize they are in

possession of these documents, and will not recognize that they have a statutory right of

rescission.

95.   Westgate's use of a secret or hidden pocket is well known among

Defendants' sales staff, who sometimes refer to the pocket as the "secret pocket," and it

has become the subject of numerous consumer complaints and internet posts.[5]

96.   This process was followed in Plaintiffs' and the Class's experience at

Westgate. Plaintiffs and the members of the Class were worn down by lengthy, high-

---

[5] Brinkmann, "Westgate Resorts denies hiding cancellation documents," Orlando Sentinel (Sept. 30, 2015), *available at* https://www.orlandosentinel.com/business/brinkmann-on-business/os-westgate-resorts-cancellation-20150930-post.html.

pressure sales pitches, and were not provided adequate disclosures about their rights or their purchase.

97.     Westgate engaged in the act, use and employment of unfair practices, illegal conduct, deception, fraud, false pretense, false promise, misrepresentation, and the concealment, suppression, and omission of material facts in connection with the offering for sale of timeshare interests to Plaintiffs and the Class in trade and commerce in the State of Missouri, and in violation of R.S.Mo. §§ 407.100, *et seq.*, to wit:

a. Engaging in unfair practices, as defined by 15 CSR 60-8.020, by employing high-pressure, hours-long sales tactics to induce Plaintiffs and the Class to purchase timeshare interests, misrepresenting the nature and value of Plaintiffs' and the Class's timeshare interests, failing to inform Plaintiffs and the Class that they did not have an interest in a particular unit, but instead a "floating use plan," and concealing legally-required documents in the secret pocket in order to prevent Plaintiffs and the Class from exercising their statutory right to cancel the timeshare purchase and/or understand their rights, and failing to provide Plaintiffs and the Class the adequate opportunity to review documents before signing;

b. Breaching the duty of good faith, as defined by 15 CSR 60-8.040, by purporting to sell an interest in a specific timeshare unit when it instead sold interests in a "floating use plan," misrepresenting the value of the timeshare interests purchased, including that such interests would accrue in value, and concealing legally-required documents in the secret pocket in order to prevent Plaintiffs and the Class from exercising their statutory right to cancel the timeshare purchase and/or understand their rights;

c.  Engaging in illegal conduct, as defined by 15 CSR 60-8.090, by utilizing a system whereby closing agents use folios containing a secret pocket, which incentivizes the closing agents to avoid giving the Plaintiffs and the Classs the disclosures that they are required by law to give, and thus preventing Plaintiffs and the Class from cancelling their purchase contract;

d.  Engaging in deception, as defined by 15 CSR 60-9.020, by using methods, acts and practices that had the tendency or capacity to mislead, deceive or cheat, or that tended to create false impressions with Plaintiffs and members of the class as to the timeshare interest they were purchasing, including their ownership rights in specific units, and by concealing legally-required documents in the secret pocket to prevent Plaintiffs and the Class from canceling the purchase contract;

e.  Engaging in fraud, as defined by 15 CSR 60-9.040, by utilizing falsehoods, deception, trickery, breach of legal or equitable duty, trust, or confidence in connection with the sale of timeshare interests by purporting to sell timeshare units when it instead sold interests in a "floating use plan" and concealing legally-required documents in the secret pocket in order to prevent Plaintiffs and the Class from exercising their statutory right to cancel the timeshare purchase and/or understand their rights;

f.  Engaging in false pretense, as defined by 15 CSR 60-9.050, and false promise, as defined by 15 CSR 60-9.60, by purporting to sell timeshare units when it instead sold interests in a "floating use plan" and concealing legally-required documents in the secret pocket in order to prevent Plaintiffs and the Class

from exercising their statutory right to cancel the timeshare purchase and/or understand their rights; and/or

g. Engaging in misrepresentation, as defined by 15 CSR 60.9.070(1), and fraudulent misrepresentation as defined by 15 CSR 60-9.100, by purporting to sell an interest in a specific timeshare unit when it instead sold interests in a "floating use plan," and misrepresenting the value of the timeshare interests purchased, including that such interests would accrue in value.

98. All of Westgate's sales agents and closing agents' actions were carried out in the course and scope of their employment with Westgate and for the benefit of Westgate as well as for themselves, and Westgate is liable for their actions under the doctrine of respondeat superior.

99. As a result of Westgate's violations of the Missouri Merchandising Practices Act, Plaintiffs and Class members have been damaged and seek appropriate injunctive relief to remedy this misconduct, along with all other remedies or damages available under § 407.100, R.S.Mo. *et. seq.*

## COUNT TWO
## UNJUST ENRICHMENT
### (Against all Defendants)

100. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

101. A benefit was conferred upon Westgate in the form of monies paid by the Plaintiffs and Class members to Westgate.

102. Westgate appreciated or had knowledge of the benefit.

103. Westgate accepted and has retained the benefit under circumstances as to

make it inequitable for Westgate to retain the benefit without payment of its value to

Plaintiffs and the Class.

**COUNT THREE**
**FRAUDULENT MISREPRESENTATION**
**(Against all Defendants)**

104.    Plaintiffs incorporate by reference all preceding paragraphs as though fully

set forth herein.

105.    Westgate engaged in a high-pressure sales pitch designed to induce Plaintiffs

and the Class to make a significant financial decision in a short time span without

accurate information.

106.    Westgate represented to Plaintiffs and the Class that, as timeshare owners,

they would have ample access to reservations.

107.    Westgate represented that is was a timeshare seller in Missouri, meaning it

had an affirmative duty under the Time-Sharing Regulation of the MMPA, R.S.Mo. §§

407.600, *et seq.*, to make certain disclosures, as described in Count One and incorporated

by reference herein. Westgate was required to fully and accurately disclose factual

information about the property and the purchaser's rights with respect thereto,

including but not limited to: specific language informing the purchaser of his, her, or

their right to rescind the agreement, whether the purchaser's participation in the

exchange program is voluntary or mandatory, the fees or range of fees for participation

in the exchange program, the number of purchasers participating in the exchange

program, and the number of units participating in the exchange program.

108.    Westgate employed a scheme to confuse consumers regarding their rights

and avoid making required disclosures of material fact while selling the timeshares to

Plaintiffs and the Class.

109.    In carrying out this scheme and failing to make the legally-required disclosures and/or intentionally hiding them so that Plaintiffs and members of the Class would not see them, Westgate fraudulently omitted material information, fraudulently induced Plaintiffs and the members of the Class to remain in the contract through the rescission period, and generally defrauded Plaintiffs and the Class.

110.    Westgate intended for Plaintiffs and the Class to rely on its representations of material fact when Plaintiffs and the Class purchased timeshare interests, and Plaintiffs and the Class did, in fact, rely on Westgate's representations.

111.    Specifically, Westgate agents Jamie Johnson, John Willman, Harry Hinz, and/or other agents whose names are not known to Plaintiffs failed to disclose material facts to Plaintiffs in connection with their timeshare purchase in November 2015 (as well as members of the Class who purchased their timeshare on other respective dates). Among these facts, Westgate failed to adequately disclose that: Plaintiffs and members of the Class were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing a "floating use plan" that would not guarantee Plaintiffs' and the Class's ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing Plaintiffs and members of the Class from utilizing their timeshare property; and Plaintiffs and members of the Class had a right to rescind the contract, as described in the legally required notice of right to cancel, which Westgate, by its agents, concealed from Plaintiffs and the Class.

112.    Westgate knew or should have known that it was omitting and failing to make certain required disclosures. The omissions described herein were material in nature, and were made to induce Plaintiffs and members of the Class to enter a contract and purchase a timeshare interest. Plaintiffs and members of the Class reasonably and

justifiably relied on Westgate's representations that omitted material facts in deciding to purchase the timeshare interest. Westgate knew these representations were false, or had complete disregard for their truth, when they were made. Westgate intended to induce reliance upon its representations, and Plaintiffs and members of the Class were entitled to rely upon the representations because the representations concerned complex matters of Westgate programs and real estate law. Thus, Plaintiffs' and the Class's reliance was reasonable under the circumstances.

113.    Plaintiffs and members of the Class were injured and damaged by virtue of their reasonable reliance on these representations containing omissions. Had Plaintiffs and members of the Class known the truth, they would not have purchased their timeshare.

114.    Westgate's omissions were intentionally made for the purpose of inducing Plaintiffs and members of the Class to enter a contract, close the sale, and remain in the contract without knowing about their rescission rights. Westgate sales agents work on commission and received commissions from the sale to Plaintiffs and the members of the Class.

115.    Alternatively, if Westgate's omissions were not intentional, they were grossly negligent because Westgate knew or should have known the truth about Westgate, its policies, and its procedures.

116.    At all relevant times, the sale- and closing-agents described herein were acting as agents of Westgate, and their actions—which were performed in the scope of their employment—are attributable to Westgate under the doctrine of *respondeat superior*.

117.    Plaintiffs and members of the Class were induced to purchase a timeshare interest from Westgate by fraud. The omission of material facts, combined with the high-pressure sales pitch, and confusing nature of the written documents between the parties were all part of a scheme devised to induce Plaintiffs and members of the Class to buy a timeshare from Westgate at substantial cost to Plaintiffs and members of the Class without complying with Missouri law.

118.    The sale, and any contract between the parties, should be rescinded, with all sums paid returned to Plaintiffs and Class members and with the timeshare interest returned to Westgate. Additionally, Plaintiffs and Class members should recover all damages and other relief to which Plaintiffs and Class members are entitled, including punitive damages, which are warranted for the intention, deceptive, unfair, and fraudulent conduct of Westgate.

**COUNT FOUR**
**FRAUDULENT INDUCEMENT**
**(Against all Defendants)**

119.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

120.    Westgate engaged in a high-pressure sales pitch designed to induce Plaintiffs and the Class to make a significant financial decision in a short time-span with inaccurate information.

121.    Westgate had an affirmative duty under the MMPA, specifically R.S.Mo. § 407.600 *et seq.*, to make certain disclosures, as described in Count One and incorporated herein. Westgate was required to fully and accurately disclose factual information about the property and the purchaser's rights with respect thereto, including but not limited to: specific language informing the purchaser of his, her, or their right to rescind the

agreement, whether the purchaser's participation in the exchange program is voluntary or mandatory, the fees or range of fees for participation in the exchange program, the number of purchasers participating in the exchange program, and the number of units participating in the exchange program.

122.    By employing a scheme to avoid making the above disclosures and/or intentionally hiding them so Plaintiffs and Class members would not see them, Westgate fraudulently omitted material information, fraudulently induced Plaintiffs and members of the Class to remain in the contract through the rescission period, and generally defrauded Plaintiffs and Class members.

123.    Specifically, Westgate agents Jamie Johnson, John Willman, Harry Hinz, and/or other agents whose names are not known to Plaintiffs failed to disclose material facts to Plaintiffs in connection with their timeshare purchase in November 2015 (as well as members of the Class who purchased their timeshare on other respective dates). Among these facts, Westgate failed to adequately disclose that: Plaintiffs and members of the Class were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing a "floating use plan" that would not guarantee Plaintinffs' and the Class's ability to stay at the resort; Westgate regularly and systematically oversold the Resort, preventing Plaintiffs and members of the Class from utilizing their timeshare property; and Plaintiffs and members of the Class had a right to rescind the contract, as described in the legally required notice of right to cancel, which Westgate by its agent(s) concealed from Plaintiffs and the Class.

124.    Westgate knew or should have known that it was omitting and failing to make certain required disclosures. The above-described omissions were material in nature, and were made to induce Plaintiffs and Class members to enter a contract to

purchase a timeshare interest. Plaintiffs and Class members reasonably and justifiably relied on Westgate's representations that omitted material facts in deciding to purchase the timeshare interests. Westgate knew of the falsity of its representations, or had utter disregard for their truth, when they were made. Westgate intended to induce reliance on the representations. Plaintiffs and members of the Class were entitled to rely on the representations because the representations concerned complex matters of Westgate programs and real estate law. Plaintiffs' and the Class's reliance was reasonable under the circumstances.

125.    Plaintiffs and members of the Class were injured and damaged by virtue of their reliance on these representations containing omissions. Had Plaintiffs and members of the Class known the truth, they would not have purchased the timeshares.

126.    Westgate's omissions were intentionally made for the purpose of inducing Plaintiffs and Class members to enter a contract, close the sale, and remain in the contract without knowing about their rescission rights. Westgate sales agents work on commission, and received commissions from the sale to Plaintiffs and Class members. Alternatively, if Westgate's omissions were not intentional, they were grossly negligent because Westgate knew or should have known the truth about Westgate, its policies, and its procedures.

127.    At all relevant times, the sales agents and other individuals described herein were acting as agents of Westgate, and their actions—which were performed in the scope of their employment with Westgate—are attributable to Westgate under the doctrine of *respondeat superior*.

128.    For the reasons described above, Plaintiffs and Class members were induced to purchase a timeshare interest from Westgate by fraud. The omissions of material

facts, combined with the high-pressure sales pitch, and the confusing nature of the written documents between the parties were all part of a scheme devised to induce Plaintiffs and Class members to buy a timeshare from Westgate at substantial cost to Plaintiffs and Class members and without complying with Missouri law.

129.     The sale, and any contract between the parties, should be rescinded, with all sums paid returned to Plaintiffs and Class members and with the timeshare interest returned to Westgate. Additionally, Plaintiffs and members of the Class should recover all damages and other relief to which they are entitled, including punitive damages, which are warranted for the intentional, deceptive, unfair, and fraudulent conduct of Westgate.

## COUNT FIVE
## NEGLIGENT MISREPRESENTATION
### (Against all Defendants)

130.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

131.     Westgate and its sales agents had a duty to disclose material facts that affected the timeshare property's value and were not known or reasonably discoverable by Plaintiffs and the Class through the exercise of ordinary diligence.

132.     As described herein, Westgate and its sales agents breached these duties and intentionally defrauded Plaintiffs and Class members rather than provide them with accurate information honestly and in good faith. Westgate, in the course of its business and in the course of a transaction in which it had a pecuniary interest, supplied false information for the guidance of Plaintiffs and the Class, omitted material facts about the transaction affecting the property's value, and failed to exercise reasonable care or competence in obtaining or communication that information.

133.    Westgate and its sales agents knew, among other things, that Plaintiffs and the Class were not buying a share in a specific unit but were instead buying into a "floating use plan"; that Plaintiff and the Class would not be able to use a Resort property when desired due to Westgate's artificial restriction of availability; and that Plaintiffs and the Class had a right to rescind their timeshare purchase under Missouri law. Westgate failed to adequately disclose these material facts to Plaintiff.

134.    Westgate and its sales agents did this for their own pecuniary benefit, in the form of commissions and increased payments to Westgate.

135.    Westgate's omissions of material fact constituted material inducements to Plaintiffs and the Class to purchase timeshare property at the Resort, to pay other charges and fees at the time of purchase, to upgrade to purportedly superior properties, and to pay charges and fees during the period of ownership.

136.    Plaintiffs and Class members were entitled to rely upon the representations of Westgate and its sales agents because of the respective position of the parties. Ordinary diligence by Plaintiffs and members of the Class would not have revealed the undisclosed facts. Plaintiffs and the Class were induced to act by the representations of Westgate and its sales agents, ignorant of the false representations and with a reasonable believe that the representations were true. Plaintiffs' and the Class's reliance was reasonable and justifiable, and caused him harm.

137.    At the time the statements of material facts were made, Westgate and its sales agents knew the statements were false. Westgate and its sales agents intentionally deceived Plaintiffs and members of the Class for the purpose of closing the sale, for the benefit of themselves (via commissions), and for the benefit of Westgate, thereby breaching duties owed to Plaintiffs and the Class.

138.    For all of these reasons, the contracts of Plaintiffs and the Class should be rescinded and Westgate should be liable for damages—including punitive damages.

## COUNT SIX
## BREACH OF IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING
### (Against all Defendants)

139.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

140.    Plaintiffs and the Class contracted with Westgate to purchase timeshare properties at the Resort.

141.    Good faith is an element of every contract relating to the purchase of timeshare property. Whether by common law or statute, all such contracts impose on each party a duty of good faith and fair dealing. Good faith and fair dealing, connected with executing contracts, discharging performance, and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. That is, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms are examples of bad faith in the performance of contracts.

142.    Subterfuge and evasion violate the obligation of good faith in performance, even when an actor believes his conduct is justified. Bad faith may be overt or may consist of inaction, while fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of power to specify terms, and interference with or failure to cooperate in the other party's performance.

143.   Westgate breached its timeshare purchase contracts with Plaintiffs and the Class—specifically the covenant of good faith and fair dealing—through Westgate's omissions, misrepresentations, and practices as alleged herein.

144.   Plaintiffs and the Class have performed all, or substantially all, of the obligations imposed on them under the subject contracts.

145.   Plaintiffs and the Class have sustained damages as a result of Westgate's breach of the contracts.

146.   Because of these breaches, the contracts should be rescinded, and Westgate should be liable for the damages caused to Plaintiffs and the Class, as well as punitive damages.

### COUNT SEVEN
### BREACH OF CONTRACT
#### (Against all Defendants)

147.   Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

148.   Plaintiffs and the Class contracted with Westgate to purchase timeshare properties at the Resort.

149.   Westgate breached its timeshare purchase contracts with Plaintiffs and the Class through its omissions, misrepresentations, and practices, including but not limited to: Westgate's failure to adequately disclose to Plaintiffs and the Class that Westgate artificially restricted the availability of timeshare units, Westgate's scheme to avoid providing required disclosures, and Westgate's failure to provide Plaintiffs and the Class the opportunity to use and enjoy their purchases.

150.   Plaintiffs and the Class have performed all, or substantially all, of the obligations imposed on them under the subject contracts.

151.    Plaintiffs and the Class have sustained damages as a result of Westgate's breach of the contracts, including loss of funds and lack of use and enjoyment of the purchased timeshare properties.

152.    Because of these breaches, the contracts should be rescinded, and Westgate should be liable for the damages caused to Plaintiffs and the Class, as well as punitive damages.

## COUNT EIGHT
## CIVIL CONSPIRACY
### (Against all Defendants)

153.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

154.    Defendants agreed to join a conspiracy to defraud consumers in the purchase of timeshare properties.

155.    Each Defendant exercised control over each other Defendant and/or all Defendants were under common control in ways that will be revealed during discovery through the production of evidence that is presently in the exclusive control of Defendants.

156.    The conspiracy had a common design, jointly and knowingly established by Defendants acting through their agents and employees.

157.    Defendants knew the object of this conspiracy was to market and sell timeshare properties to Plaintiffs and the Class without adequately disclosing, among other things, that Plaintiffs and the Class were not buying a share in a specific unit but were instead buying into a "floating use plan"; that Plaintiffs and the Class would not be able to use a Resort property when desired due to Westgate's artificial restriction of availability; and that Plaintiffs and the Class had a right to rescind their timeshare

purchases under Missouri law. The objects of the conspiracy were fraud, breach of contract, unjust enrichment, negligent misrepresentation, and/or violations of the Missouri Merchandising Practices Act, as described more fully herein. Defendants knew these objects were unlawful and would be accomplished by unlawful means such as fraud, misrepresentations, and omissions.

158.    Defendants had a meeting of the minds on the object of or course of action for this conspiracy. Defendants knew and agreed on the unlawful object or course of action for this conspiracy. Defendants also knew their wrongful actions would inflict injury on the targets of the conspiracy, including Plaintiffs and the Class.

159.    Defendants committed multiple unlawful and overt acts to further the object or course of action for this conspiracy, as described herein.

160.    These unlawful acts proximately caused the damages suffered by Plaintiffs and the Class. Accordingly, Plaintiffs and the Class are entitled to recover their actual damages, plus costs, attorneys' fees, and pre-judgment and post-judgment interest.

## PRAYER FOR RELIEF

In light of the foregoing, Plaintiffs respectfully request:

161.    This action to be certified pursuant to Fed. R. Civ. P. 23 (b)(2), (b)(3), and (c)(4) as a class action on behalf of the proposed Class and subclasses (as warranted); that the named Plaintiffs be appointed as Class Representatives; and that counsel below be designated Class Counsel;

162.    That an injunction be issued declaring that Plaintiffs and proposed Class members have a right to rescind the timeshare purchase contracts and that Defendants must disgorge profits received from them; and enjoining Defendants from using folders containing secret pockets, violating the Missouri Merchandising Practices Act, and

specifically from selling timeshare properties while restricting purchasers' ability to use them, failing to disclose that their availability is limited, and failing to disclose that purchasers have a right to rescind their purchase;

163.   Judgment to be entered against all Defendants on all causes of action and damages suffered;

164.   Plaintiffs and the Class be awarded the full, fair, and complete recovery for all causes of action and damages suffered;

165.   Plaintiffs and the Class be awarded rescission, damages, punitive damages, restitution, attorneys' fees, and costs;

166.   Plaintiffs and the Class be awarded all appropriate costs, fees, expenses, and pre- judgment and post-judgment interest, as authorized by law; and

167.   Such other equitable or legal relief that the Court deems just and proper.

**JURY TRIAL DEMAND**

168.   Plaintiffs request a jury trial on all issues so triable.


Dated: September 9, 2019                Respectfully submitted,


                                        By: */s/ Matthew D. Schultz*
                                            Matthew D. Schultz (FBN 640328)
                                            William F. Cash, III (FBN 68443)
                                            Brenton Goodman (FBN 126153)
                                            LEVIN, PAPANTONIO, THOMAS,
                                            MITCHELL, RAFFERTY &
                                            PROCTOR, P.A.
                                            316 S. Baylen St., Suite 600
                                            Pensacola, FL 32502
                                            Telephone: 850-435-7140
                                            Facsimile: 850-436-6140
                                            mschultz@levinlaw.com
                                            bcash@levinlaw.com
                                            bgoodman@levinlaw.com

John F. Edgar*
Michael R. Owens*
Brendan M. McNeal*
EDGAR LAW FIRM LLC
2600 Grand Blvd., Ste. 440
Kansas City, MO 64108
Telephone: (816) 531-0033
Facsimile: (816) 531-3322
jfe@edgarlawfirm.com
mro@edgarlawfirm.com
bmm@edgarlawfirm.com

*Attorneys for Plaintiffs Individually
and on Behalf of Themselves and All
Others Similarly Situated*

*Motion for Pro Hac Vice to be
submitted.